UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


NINALEE MARIE O'TOOLE,       )
         Plaintiff           )
              v.             )      C.A. No. 10-cv-30173-MAP
                             )
MICHAEL J. ASTRUE,           )
COMMISSIONER, SOCIAL         )
SECURITY ADMINISTRATION,     )
         Defendant           )


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND DEFENDANT'S MOTION FOR ORDER
AFFIRMING THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 8 & 12)

July 7, 2011

PONSOR, D.J.

I. INTRODUCTION

This action seeks review of a final decision of the
Commissioner of Social Security ("Commissioner") denying
Plaintiff's application for Social Security Disability
Insurance benefits and Supplemental Security Income.
Plaintiff applied for benefits on April 7, 2008, alleging
disability since January 1, 2001, due to back pain, post-
traumatic stress disorder, depression, and anxiety.  (A.R.

158.)  Plaintiff's claim was denied initially and upon reconsideration.  She requested an administrative hearing, which was held on February 2, 2010, before an administrative law judge ("ALJ"), who, on March 18, 2010, issued his decision, finding that Plaintiff had not been disabled within the meaning of the Social Security Act, 42 U.S.C. § 1382c, since her date of application.  (A.R. 7.)  The ALJ's decision became final when the Decision Review Board failed to complete its review within the allotted time.

Plaintiff has now moved for judgment on the pleadings (Dkt. No. 8), and Defendant has moved for an order affirming the decision of the Commissioner (Dkt. No. 12).  For the reasons stated below, the court will allow Defendant's motion and deny Plaintiff's motion.

## II. <u>FACTS</u>

### A.  <u>Personal Life and Work Experience</u>.

Plaintiff, who was thirty-nine years old at the time of the hearing, lives with her fiancé, her three daughters -- ages nineteen, seventeen, and four -- and her granddaughter, age eighteen months.  Plaintiff graduated from high school and took seven courses toward a college degree.  (A.R. 27.) Until 2001, Plaintiff worked full-time in a variety of occupations, including as a customer services representative

both for a bank and for a valet service, a convenience store clerk, and a waitress.  In 2001, Plaintiff reduced her hours to part-time due to "stress and pain."  (A.R. 211.)  She explained that she "slowly got warnings for missing work and got my hours reduced then job disability then fired."  (A.R. 211.)

On a March 2005 medical history form, Plaintiff indicated that she was a student and a daycare provider. (A.R. 525.)  In August 2008, Plaintiff stated that she "babysat" her daughter, who was three at the time, and her granddaughter, who was three-months old.  (A.R. 178.)

At the hearing, Plaintiff testified that she now spends her entire day doing housework, preparing meals, and caring for her daughter and granddaughter.  (A.R. 34.)  By the evening, she is "drained mentally and physically."  (A.R. 190.)  Plaintiff drives on a weekly basis to run errands and to visit her sister and her mother.  (A.R. 28.)  She enjoys watching television, listening to the radio, reading, and painting, all of which are activities that she engages in regularly.  (A.R. 35.)

B.  <u>Medical Evidence</u>.

   1.  <u>Back</u>.

   a. <u>Plaintiff's Statements</u>.

In August 2008, Plaintiff reported on her Social

Security Disability application that she suffers from upper and lower back pain, numb arms, and that her left shoulder pain radiates to her teeth, head, and eyes.  She also has headaches and right shoulder pain "all the time."  (A.R. 180.)  Plaintiff takes Percocet, Tylenol, and ibuprofen for her pain.  (A.R. 189.)  She has also used pain patches. (A.R. 194.)  Without medication, her daily pain score is a six or seven; with medication, it is a four.  (A.R. 30.)

Because of her back pain, when she does housework, she requires intermittent breaks.  (A.R. 41.)  She is unable to carry a laundry basket or mop.  (A.R. 168.)

Plaintiff testified that she is unable to lift her granddaughter but is able to carry a gallon of milk with two hands.  (A.R. 41.)  She can walk for about two blocks, stand for about fifteen minutes, and sit for about fifteen minutes before her back begins to hurt.  (A.R. 35.)  There are mornings when she wakes up and is unable to walk, and her left leg "gives out at least monthly."  (A.R. 38, 211.)

b. Medical Records.

At age twelve, Plaintiff was diagnosed with scoliosis, and she wore a back brace for about five years.  (A.R. 506.)

In February 1996, Plaintiff presented to the emergency room at Mercy Hospital with back pain, and an examination revealed rotoscoliosis of the lumbar spine but no acute

4

fracture or dislocation.  (A.R. 420.)

In February 2000, Plaintiff again presented to the emergency room at Mercy Hospital with low back pain that had persisted for four days.  (A.R. 364.)  She was released with several prescriptions for pain medication but returned three days later with pain radiating down both of her legs.  (A.R. 364.)  The hospital report indicates that Plaintiff "was unable to be awake" and that oral medications were having no effect on her pain.  (A.R. 366.)

On October 19, 2000, state agency physician Dr. Samuel Antiles examined Plaintiff.  Plaintiff reported to him that she was regularly bedridden for two-to-four weeks at a time due to back pain.  Although Plaintiff took Oxycontin and Percocet, neither relieved the pain, nor did physical therapy.  (A.R. 221-22.)  X-rays revealed levoscoliosis and disc-space narrowing.  (A.R. 222.)

Over a year later, in January 2002, Plaintiff underwent back surgery to repair a herniated disk.  (A.R. 355-358.)  The following month she was seen by Dr. Claude Borowsky at Pioneer Spine and Sports Physicians.  He gave her an epidural injection (A.R. 229), which she stated temporarily relieved some of her back pain.  (A.R. 227.)  Upon examination, Dr. Borowsky found that Plaintiff's range of motion in her left hip was significantly limited, with about half of a normal range of motion.  (A.R. 227.)  In October

2002, Plaintiff received facet joint injections to relieve her pain, which provided minimal relief for about two days. (A.R. 225.)

On February 8, 2003, Plaintiff was involved in a car accident. She was treated through May by Dr. Vijay Patel for back injuries that she sustained. (A.R. 294-302.) Although Plaintiff initially complained of pain in her neck, shoulders, lower back, and wrist, in Dr. Patel's May 20, 2003, "final evaluation," he reported that Plaintiff "states that her back pain has resolved and she denies any pain doing activities." (A.R. 294.) He further noted that Plaintiff denied any other symptoms and was taking no medication. Her range of motion was normal, and she was "pain free." (A.R. 294.) Dr. Patel's report notes that throughout her treatment with him, Plaintiff was "partially disabled." (A.R. 294.)

Following the car accident, in April 2003, Plaintiff was also treated by chiropractor Mark Czerniak, who noted that Plaintiff complained of exacerbation of right-side low back pain and new left-side low back pain. Plaintiff rated her pain level for her low back pain at a five out of ten. She also reported that her neck pain due to the accident was at two or three out of ten. (A.R. 231.) Upon examination, Mr. Czerniak determined that Plaintiff had decreased ranges of cervical and lumbar motion, and an MRI showed little

change from an April 2003 MRI.  (A.R. 231.)  After nine weeks of treatment, in June 2003, Mr. Czerniak stated that Plaintiff had made "excellent progress."  (A.R. 232.)

On September 9, 2005, Plaintiff delivered her youngest daughter after a "[s]pontaneous, uneventful pregnancy." (A.R. 323.)

On February 7, 2008, Plaintiff's therapist, Lori McEachern, filled out an initial intake form, which indicated that, although Plaintiff stated she suffered from both back pain and weakness and numbness in her legs, she did not identify any difficulties with kneeling, sitting, standing, walking, climbing stairs, or balancing.  (A.R. 576.)

In August 2008, Plaintiff was examined by physician's assistant Debbie L. Murray, who reported that Plaintiff was suffering from upper back pain that was causing headaches. (A.R. 460.)  Plaintiff rated her pain as constant and five-to-six on a scale of ten.  (A.R. 509.)  Upon examination, Ms. Murray found Plaintiff to be in "mild distress" and recommended massage therapy, chiropractic care, and Percocet.  (A.R. 461.)  Plaintiff began chiropractic care with Michael Nicaretta who, by October 2008, reported that Plaintiff's mid and lower back pain was "doing slightly better."  (A.R. 505.)

On April 1, 2009, physician's assistant Patrick Gibson

at Riverbend Medical Center prescribed Prednisone for
Plaintiff for a neck spasm causing pain in the right side of
her neck and face.  (A.R. 580.)  Two weeks later, on April
15, Plaintiff saw Dr. Hyun-Young Park, also at Riverbend,
and reported that the Prednisone was helping her neck
although she was experiencing numbness in her fourth and
fifth fingers.  (A.R. 583.)  Dr. Park noted that Plaintiff
was "[a]lert, oriented, pleasant, [and] in no acute
distress" and recommended physical therapy.  (A.R. 584-85.)

On April 23, 2009, Plaintiff began physical therapy
with Lisa Millett, who reported Plaintiff's pain level in
her neck and back as eight out of ten and stated that her
pain increased with "lying in bed" but decreased with
medication.  (A.R. 590, 625.)  Ms. Millett recommended two
sessions of physical therapy per week for four-to-six weeks,
ultrasound with hydrocortisone cream, electric stimulation,
and hot and cold packs.  (A.R. 626.)  Plaintiff continued
physical therapy throughout May and reported decreased pain.
(A.R. 592.)

In December 2009, Plaintiff was seen by Physician's
Assistant Ryan Garso, who noted that she was complaining of
pain in her lower back that had been present for a week.
(A.R. 635.)  Plaintiff described her pain level as six out
of ten and denied any weakness or numbness in her legs.  Mr.
Garson reported that Plaintiff was "[a]lert and in no acute

distress" and prescribed Vicodin and Flexeril.  (A.R. 636.)

    2.  <u>Anxiety</u>.

Plaintiff's anxiety and post-traumatic stress disorder arise out of a 1996 incident in which she was slashed with a knife during a robbery while she was at work in a convenience store.  Following the assault, Plaintiff was transported by ambulance to the hospital and was discharged later that evening after a five-inch laceration on her neck, which the emergency room report indicates was not bleeding, was closed with "Steri-Strips."  (A.R. 428.)  The emergency room report states that Plaintiff was "in no distress." (<u>Id.</u>)  Plaintiff was advised to keep the Steri-Strips on for five days and then to remove them herself.  (A.R. 432.)  In a 2005 medical report, Dr. Anne Shain stated that Plaintiff described the incident to her as follows: "She was working in a convenience store in 1996, was stabbed, her throat was cut and she was left for dead."  (A.R. 471.)

    a. <u>Plaintiff's Statements</u>.

Plaintiff describes her post-traumatic stress disorder as manifesting in panic attacks.  Prior to 2001, her panic attacks often came on at work and were accompanied by vomiting and diarrhea.  (A.R. 28, 172.)  She left her most recent position as a waitress after she had a panic attack at work.  (A.R. 199.)

Plaintiff reported that since the robbery, she rarely

goes outside but occasionally will take her daughter to the park with friends.  (A.R. 170.)  She stated that she has "anxiety attacks around strange men" and when she is alone outside of the house.  (A.R. 169, 196.)  She feels nervous when she carries cash and is unable to go alone to "places where money exchanges hands."  (A.R. 197.)  She no longer goes to restaurants, has dinner parties, or goes dancing.  (A.R. 171.)  Plaintiff stated that she has trouble sleeping and is always exhausted.  (A.R. 191.)  She has "awful" nightmares, and her screams wake up her family.  (A.R. 191.)  With regard to her ability to concentrate, Plaintiff stated that she rarely finishes things she begins; for example, she never watches an entire movie.  (A.R. 198.)

b. Therapist Lori McEachern.

From February 7, 2008, through September 2008, Plaintiff received intermittent care from clinician Lori McEachern at the Center for Psychological and Family Services.  In her initial intake form, Ms. McEachern noted that Plaintiff stated that she sometimes had difficulty concentrating and remembering, had difficulty sleeping, and described herself as being unable to function.  (A.R. 576-77.)  Ms. McEachern reported that Plaintiff's anxiety could be "triggered by men of a certain height, money, convenience stores, and sometimes sweeping or knives."  (A.R. 571.)

In May 2008, Ms. McEachern noted that Plaintiff's

daughter had recently had a baby and moved in with her.
(A.R. 565.)  The baby's father was involved in the robbery
of a jewelry store.  Due to financial difficulties,
Plaintiff's heat and hot water had been shut off.  Plaintiff
reported an increase in her anxiety and depression since her
first visit in February.  Ms. McEachern observed that
Plaintiff "is articulate and intelligent but she has
numerous quality of life stressors."  (A.R. 565.)

Also in May, Ms. McEachern completed a "Psychiatric
Disorder" form, which was cosigned by psychiatrist Dr. Alan
Stone.  On the form, Ms. McEachern indicated that Plaintiff
had been experiencing "major depressive episodes" since the
assault in 1996.  (A.R. 345.)  She stated that Plaintiff had
a flat affect and appeared lethargic, though she was alert
and oriented with no perceptual distortions.  (A.R. 345.)
Ms. McEachern wrote that Plaintiff's depression, manifesting
as lethargy and lack of motivation, was impacting her
ability to run a daycare out of her home.[1]  (A.R. 345.)  She
stated that Plaintiff became "easily overwhelmed" and has
"withdrawn from all . . . social situations."  (A.R. 345.)

One month later, in June 2008, Ms. McEachern noted that
Plaintiff showed marked improvement, observing that she

_____

[1] Based on this reference, it is unclear whether
Plaintiff was caring solely for her daughter and
granddaughter, or whether she was caring for other children
as well.

11

lived independently; her cognitive functioning was intact; she had no apparent deficits in her ability to concentrate; she was capable of walking and driving on her own; and her primary limitation was an inability to work in convenience stores. (A.R. 472-73.)

After Plaintiff's September visit, Ms. McEachern noted that Plaintiff was articulate and responsible but suffered from anxiety and depression and was noncompliant. (A.R. 563.) On December 16, 2008, Plaintiff was discharged from therapy based on "poor compliance result[ing] in limited progress toward [decreasing] depression and anxiety." (A.R. 562.)

c. Miscellaneous Providers.

In June 2005, Plaintiff was seen by Dr. Anne Shain who noted that Plaintiff described her post-traumatic stress disorder as "well controlled" with Paxil. (A.R. 471.) Dr. Shain further noted that Plaintiff would continue to use Paxil as she "has been very stable with this." (A.R. 471.)

On March 18, 2008, Plaintiff was treated for gall stones by Dr. Karen Kupfer. Dr. Kupfer noted that Plaintiff "is generally in good health" with no signs of "psychiatric illness." (A.R. 342.)

On March 24, 2008, Plaintiff was examined by Dr. Park. (A.R. 335.) Dr. Park's notes state that Plaintiff did not suffer from sleep disturbances but that she reported

12

sciatica, scoliosis, and post-traumatic stress disorder.
(A.R. 335.)  Dr. Park described Plaintiff as "[a]lert,
oriented, pleasant, in no acute distress."  (A.R. 336.)  She
diagnosed her with depression and prescribed Paxil.  (A.R.
337.)  She also prescribed Chantix, a medication to help
Plaintiff quit her one-pack-per-day smoking habit.

On April 1, 2009, Plaintiff reported to Physician's
Assistant Patrick Gibson that her anxiety had been worsening
and that she had not left her house for one month prior to
the visit.  (A.R. 580.)

C.   Substance Use.

Throughout the record are references to Plaintiff's
occasional use of alcohol and marijuana and very infrequent
use of cocaine.  (A.R. 364, 355, 525, 580, 635.)  In April
2005, during what appeared to be a routine prenatal urine
test, Plaintiff tested negative for all drugs, including
marijuana and cocaine.  (A.R. 548.)  In February 2008,
Plaintiff's therapist, Lori McEachern, noted on Plaintiff's
intake form that Plaintiff smoked marijuana about once a
week, used cocaine about once a year, and drank alcohol once
or twice a week.  (A.R. 572-73.)  She further noted that
there was no indication of a history of substance abuse.

D.   Residual Functioning Capacity Assessments.

1.   Physical Residual Functioning Capacity
     Assessments.

In June 2008, medical consultant Dr. Malin Weeratne conducted an examination of Plaintiff and completed a physical residual functioning capacity ("RFC") assessment. (A.R. 434-41.) Dr. Weeratne, who found Plaintiff to be credible, determined that she could occasionally lift twenty pounds; frequently lift ten pounds; stand, walk, or sit for six hours in a normal eight-hour work day; push, pull, and reach with no restrictions; frequently climb, balance, and kneel; and occasionally balance, crouch, and crawl. (A.R. 435-36.) Dr. Weeratne noted that Plaintiff is independent, uses no assistive devices, does household chores, and shops. Dr. Weeratne also stated that "no problems were seen or perceived." (A.R. 435.)

Dr. Elaine Hom completed a second physical assessment in October 2008 based on a review of the medical record. She opined that Plaintiff's allegations were "out of proportion" with the medical record and thus that she was only partially credible. (A.R. 483.) Dr. Hom's determinations of Plaintiff's limitations were nearly identical to Dr. Weeratne's with the exception that she found Plaintiff only occasionally, as opposed to frequently, able to climb, balance, and kneel. (A.R. 480.)

2.  <u>Mental Residual Functioning Capacity Assessments</u>.

In June 2008, medical consultant Peter Robbins completed a mental RFC assessment based on a review of

14

Plaintiff's medical records.  (A.R. 442-59.)  He opined that
Plaintiff had moderate restrictions in activities of daily
living and in her ability to maintain concentration and mild
difficulties in her ability to function socially.  (A.R.
452.)  He further opined that she was not significantly
limited in her ability to understand and remember, to
interact socially, and to adapt to a work environment.  The
only limitations he found were a moderate limitation in her
ability to carry out detailed instructions and to maintain
concentration for extended periods.  (A.R. 456-57.)

    Brian Sullivan, Ph.D. completed a second mental
assessment in October 2008, again based on his review of
Plaintiff's medical records.  (A.R. 486-502.)  It varied
only slightly from Mr. Robbins's June assessment.  Unlike
Mr. Robbins, Dr. Sullivan opined that Plaintiff's mood
changes and anxiety would potentially impact her ability to
consistently perform detailed tasks and that Plaintiff might
have difficulty with early morning punctuality.  He further
opined that Plaintiff would have difficulty working with the
general public.  (A.R. 488.)

E.    The ALJ's Findings.

    The SSA disability determination is subject to a five-
step process under 20 C.F.R. § 404.1520.  At the outset, the
ALJ determined that Plaintiff met the insured status

15

requirements of the Social Security Act through December 31, 2004, but not thereafter.  (A.R. 9.)  At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability of January 1, 2001.  (Id.)  At Step Two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine and anxiety. (Id.)  At Step Three, the ALJ found that Plaintiff's impairments did not medically equal the criteria of the listed impairments in 20 C.F.R. 404, Subpart P, App. 1. (A.R. 10.)  At Step Four, the ALJ determined that Plaintiff had the

> residual functioning capacity to perform light
> work . . . [,] except she is unable to climb
> ropes, ladders, or scaffolds and is unable to use
> left foot or leg controls.  She can occasionally
> climb ramps and stairs, and occasionally stoop,
> crouch, and kneel, but needs to avoid concentrated
> exposure to cold and vibration.  Nonexertionally,
> she is limited to simple, routine, and repetitive
> tasks with only occasional interaction with the
> general public.

(A.R. 11.)

At Step Five, the ALJ determined that Plaintiff could not perform any of her past work but had the RFC to perform occupations such as a line worker or price marker.  (A.R. 16.)

### III. DISCUSSION

16

Plaintiff has raised three arguments on appeal. First, Plaintiff argues that the ALJ erred at Step Four because his determination of her RFC is not supported by substantial evidence. Second, Plaintiff contends that the ALJ failed to give proper weight to the opinions of her treating physicians that the severity of her impairments would interfere with her level of functioning. Third, Plaintiff argues that the ALJ improperly considered her occasional use of drugs and alcohol in assessing her credibility. Unfortunately for Plaintiff, none of these arguments is supported by the record.

A.    Standard of Review.

Judicial review of a final decision of the Commissioner is limited to whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the administrative law judge. See id. at 10. The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401

(1971).  Accordingly, the court must affirm the
Commissioner's findings "if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as
adequate to support his conclusion."  <u>Rodriguez v. Sec'y of
Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981).
This is true "even if the record arguably could justify a
different conclusion."  <u>Rodriguez Pagan v. Sec'y of Health &
Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.    <u>Residual Functioning Capacity</u>.

        Plaintiff contends that in arriving at her RFC, the ALJ
ignored the evidence of her chronic back pain as well as her
depression and anxiety.  Significantly, the ALJ found that
Plaintiff met the insured status requirements of the Social
Security Act through December 31, 2004.  After this date, he
determined that Plaintiff had failed to establish the
requisite correlation between her alleged chronic pain and
anxiety and any "medically determinable physical or mental
impairment."  42 U.S.C. § 423(d)(1)(A).  Nevertheless, the
ALJ limited Plaintiff to light work involving only simple
and repetitive tasks and little interaction with the public.
(A.R. 11.)  Having examined the medical evidence from
January 2005 forward, the court finds that, although
evidence exists that might be deemed conflicting, the ALJ's
RFC assessment is supported by substantial evidence.

        1.    <u>Evidence of Chronic Pain</u>.

The first medical report in 2005 is from September 9, when Plaintiff's youngest daughter was born. The hospital notes do not indicate that Plaintiff's back pain had any impact on the delivery. (A.R. 323-24.) The record is then silent until February 2008, when Plaintiff's therapist, Ms. McEachern, noted that, although Plaintiff stated she had back pain, she reported no difficulties with kneeling, sitting, standing, walking, climbing stairs, or balancing. (A.R. 576.) Six months later, in August 2008, Physician's Assistant Debbie Murray examined Plaintiff based on her complaints of back pain and sciatica and, finding her to be in "mild distress," recommended massage therapy, chiropractic care, and Percocet. (A.R. 460-61.)

In April 2009, Plaintiff was prescribed Prednisone to relieve a neck spasm. Dr. Park described her at that time as "[a]lert, oriented, pleasant, [and] in no acute distress." (A.R. 584-85.) Although in July 2009, Plaintiff reported that her pain was frequent and a seven-to-eight on a scale of ten (A.R. 590), it appears that the pain subsided because by December 2009 she complained of pain in her lower back that had been present only for a week. (A.R. 635.) Plaintiff, who stated that her pain level was six out of ten, was described as "[a]lert and in no acute distress." (A.R. 636.)

It is significant that not a single medical provider or

examiner, out of the many who saw her or evaluated her
record, opined that Plaintiff was unable to work.  Both of
Plaintiff's physical RFC examiners recommended certain
restrictions, all of which the ALJ included in the RFC
assessment.  On this record, the court is constrained to
find that the ALJ's physical RFC determination is supported
by substantial evidence.

    2.   <u>Evidence of Depression and Anxiety</u>.

    As with Plaintiff's claim of physical impairment,
Plaintiff's claim of a disabling mental impairment lacks
support in the reports of her care providers.  A fair
reading of the record reveals that the only evidence of
disabling mental impairment is Plaintiff's own description
of her anxiety and depression.

    The earliest record of any mental impairment is in a
June 2005 medical report in which Dr. Anne Shain stated that
Plaintiff told her that her symptoms of post-traumatic
stress disorder were "well controlled" with Paxil.  (A.R.
471.)  Dr. Shain herself noted that Plaintiff "has been very
stable" on Paxil.  (A.R. 471.)

    For nearly three years, until February 2008, Plaintiff
sought no mental health care.  At that time, Plaintiff began
treating with therapist Lori McEachern.  Although Ms.
McEachern reported that Plaintiff described herself as being
unable to function (A.R. 577), Ms. McEachern's notes do not

indicate agreement with that self-assessment.  To the
contrary, Ms. McEachern described Plaintiff as "articulate
and intelligent"  (A.R. 565) and noted that she was alert
and oriented with no perceptual distortions.  (A.R. 345.)
Although easily overwhelmed and lethargic, Plaintiff ran
what Ms. McEachern described as a "daycare" from her home.
(A.R. 345.)  Ms. McEachern further noted that Plaintiff
described herself as having "very good office skills" and
"all the pre reqs for nursing course."  (A.R. 573.)  Ms.
McEachern recommended a treatment plan that included weekly
therapy sessions and a monthly psychiatry session as well as
meditation and walking.  (A.R. 568.)

    In June 2008, Ms. McEachern described Plaintiff as able
to live independently with no apparent deficits in her
ability to concentrate.  (A.R. 472-73.)  After what turned
out to be Plaintiff's final visit in September 2008, Ms.
McEachern noted that Plaintiff was articulate and
responsible but suffered from anxiety and depression.  (A.R.
563.)  On December 16, 2008, Plaintiff was discharged from
therapy due to poor compliance, stemming at least partly
from her irregular attendance.  (A.R. 562.)

    Not only does Plaintiff's "failure to follow prescribed
medical treatment contradict[] subjective complaints of
disabling conditions," Russell v. Barnhart, 111 Fed. Appx.
26, 27 (1st Cir. 2004) (per curiam), but the dearth of

treatment notes left the ALJ with no evidence on which he
could justifiably have found her to be completely disabled
due to her mental impairment.  The ALJ considered the
opinions of both of Plaintiff's mental RFC examiners and
determined that she had the capacity to perform simple work
that required limited attention to detail.  These
limitations are consistent with Plaintiff's medical record.
Accordingly, with respect to the ALJ's mental RFC
assessment, the court finds that it is supported by
substantial evidence.

C.    Plaintiffs' Treating Physicians' Opinions.

     Plaintiff argues that the ALJ's conclusions are
contradicted by the opinions of her treating physicians who,
she alleges, opined that her impairments would interfere
with her level of functioning.  In support, Plaintiff cites
primarily to her treating physicians' reports of her own
descriptions of the severity of her conditions.  The only
actual treating source opinion that Plaintiff points to is
Ms. McEachern's May 2008 statement that Plaintiff's
"depression significantly impacts the level of functioning."
(A.R. 347.)  This isolated remark, which does not identify
any specific limitations caused by Plaintiff's depression,
is insufficient to support a finding that the ALJ erred in
his assessment of Plaintiff's treating physician's opinions.
See 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain

or other symptoms will not alone establish that you are
disabled; there must be medical signs and laboratory
findings which show that you have a medical impairment(s)
which could reasonably be expected to produce the pain or
other symptoms alleged . . . .").

D.   Plaintiff's Credibility.

     Plaintiff's final argument is that the ALJ erred in
describing her use of marijuana and cocaine as
"polysubstance abuse" and, further, finding that her drug
use undermined her overall credibility.  (A.R. 13.)  Even if
the court disagreed with the ALJ on this point, however, the
ALJ provided other compelling factors that led to his
overall determination that Plaintiff's "statements
concerning her impairments and their impact on the ability
to work are considerably more limited and restricted than is
established by the medical evidence."  (Id.)

     The ALJ found that, despite her alleged physical
restrictions, Plaintiff admitted that she was able to do
housework, cook, watch her daughter and granddaughter, and
shop.  While he commended her for taking college courses,
the ALJ observed that her ability to do so in 2005 further
belied her allegations of an inability to work.  He
additionally noted that no objective medical grounds
supported her "self-imposed restrictions."  (Id.)  Finally,
he observed that she appeared to be in no distress during

the hearing.  Thus, the court finds that the ALJ's consideration of Plaintiff's occasional drug use was inconsequential.

In sum, while the record demonstrates that Plaintiff has some severe impairments that undoubtedly impact her ability to perform some jobs, the record contains substantial support for the ALJ's conclusion that Plaintiff is able to work with relatively modest limitations.  (A.R. 13.)  Of course, if Plaintiff's condition deteriorates, she may file a new application for benefits.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 8) is hereby DENIED, and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No. 12) is hereby ALLOWED.  The clerk will enter judgment for Defendant.  The case may now be closed.

It is So Ordered.

<u>/s/ Michael A. Ponsor</u>
MICHAEL A. PONSOR
U. S. District Judge